Thomas R. CROWEL, Appellant,

v.

MARSHALL COUNTY DRAINAGE BOARD, Appellee.

No. 50A03–1011–MI–606.

Court of Appeals of Indiana.

Aug. 10, 2011.

Mark A. Bates, Schererville, IN, Attorney for Appellant.

James N. Clevenger, Wyland, Humphrey, Wagner & Clevenger, LLP, Plymouth, IN, Attorney for Appellee.

## OPINION

MATHIAS, Judge.

Thomas R. Crowel ("Crowel") appeals from the Marshall Circuit Court's order denying his petition for judicial review in favor of the Marshall County Drainage Board ("the Drainage Board"). Crowel raises one issue for our review, which we restate as whether the trial court erred in concluding that the Drainage Board's decision was not arbitrary, capricious, unlawful, or not supported by substantial evidence. We reverse and remand with instructions.

### Facts and Procedural History

In 1908, William H. Myers and other landowners in Marshall County successfully petitioned for the construction of a public drain and, as a result, construction of the Myers Ditch was completed in 1913. The Myers Ditch is comprised of an open ditch and eight clay tile arms. At issue in this case is the reconstruction of arm number seven ("Arm # 7") of the Myers Ditch.

The 358–acre watershed area of Arm # 7 is composed of commercial, agricultural, and residential land, and includes Crowel's twenty-six-acre parcel of farm land. At a 1998 meeting of the Drainage Board, several owners of property located within the watershed complained of flooding and water in their basements. In 1999, thirteen landowners filed a petition with the Drainage Board seeking relief. No action was taken on the petition until ten years later, when the flooding issue was brought up again at a June 2009 Drainage Board meeting. The surveyor subsequently filed a report with the Drainage Board classifying Arm # 7 as a drain in need of reconstruction. Specifically, the surveyor concluded that the tile was "not adequate to perform the function for which it was designed and constructed" and proposed that a new route for the tile be constructed. Appellant's App. p. 33. In his report, the surveyor estimated the cost of reconstructing Arm # 7 at $114,474, listed the property owners to be assessed, and proposed an assessment schedule. After receipt of the surveyor's report, the Drainage Board published notice and scheduled a public hearing for March 15, 2010.

As a result, Crowel received notice that he would be charged a reconstruction assessment of over $7,000.00 under the proposed assessment schedule. Prior to the public hearing, Crowel and others filed letters with the Drainage Board objecting to the proposed assessment. Crowel again

objected to the assessment at the March 15 public hearing, arguing that his agricultural property, which is located at the higher end of the watershed, did not suffer from the flooding problems complained of by the residential property owners at the lower end of the watershed and that, as a result, his property would not be benefitted by the reconstruction. Although Crowel testified that a small portion of his land occasionally flooded after heavy rains, he claimed that the reconstruction project would not alleviate the problem because a private tile drain located on that portion of his land and connecting to Arm # 7 has been blocked by a utility company's gas line.

The surveyor testified at the public hearing that Crowel's land would be benefitted by the reconstruction if the blockage was removed from Crowel's private tile. The surveyor testified further that because Crowel's private tile was outside the Drainage Board's jurisdiction, it would be up to Crowel to see to it that the blockage was cleared. Additionally, the surveyor and Drainage Board member Jack Roose noted that because Crowel's property is situated at the higher end of the watershed, surface water runoff from his land contributes to the flooding problems experienced by the owners of the lower-lying properties. At the conclusion of the hearing, the Drainage Board determined that the costs of the project would be less than the benefits accruing to the affected landowners and approved the proposed reconstruction plan. On the same date, the Drainage Board issued a written order adopting the surveyor's proposed assessment schedule.

On March 31, 2010, Crowel filed a petition for judicial review. The trial court held a hearing on the petition on September 17, 2010. On September 30, 2010, the trial court entered an order denying Crow-

el's petition. The order was accompanied by the following relevant findings of fact:

6. [Crowel] alleges that his property does not suffer from the flooding problems complained of by the affected landowners who own (or owned) property at the lower end of the watershed and that therefore he would receive no benefit from the reconstruction or relocation of Arm # 7 of the Myers Drain.

7. The evidence shows that [Crowel's] farm ground is at or near the higher end of the watershed area and the natural flow of storm water run-off carries the water from his real estate to that of the lower situated landowners.

8. The Court finds that flooding problems suffered by the affected (primarily residential) landowners at the lower portion of the watershed result in part from dealing with the water run-off from [Crowel's] farm ground and the other agricultural ground located at the highest point of the watershed area.

9. The Drainage Board found it to be appropriate for all parcel owners within the watershed to bear some cost of the project and established a tiered rate structure for agricultural acreage, residential acreage (double the agricultural rate) and commercial acreage (triple the agricultural rate).

10. [Crowel] alleges that the Board's decision was arbitrary, capricious, unlawful or not supported by substantial evidence in that the decision was not based upon any drainage study or any scientific method.

11. The evidence before the Board at the public hearing held on March 15, 2010, included detailed maps of the watershed area to include [Crowel's] acreage as well as profile and elevation studies of the newly proposed drain.

12. The testimony of the surveyor at the public hearing held on March 15,

2010, established that [Crowel's] property fell within the watershed of Arm # 7 of the Myers Drain and that surface runoff water from his property contributed to the flooding problems experienced by the homeowners at the lower end of the watershed.

13. [Crowel] did not present any credible evidence that his property was not within the watershed of Arm # 7 of the Myers Drain.

14. [Crowel's] primary allegation was that his property would not be benefitted because his property did not flood when the parcels lower in the watershed flooded.

15. The Board's finding that [Crowel's] property contributed to the flooding problems of the lower owners and that it was therefore appropriate that as a parcel within the watershed, he should contribute to the cost of the project is not arbitrary, capricious, nor unlawful and is supported by substantial evidence.

Appellant's App. pp. 5–6. Crowel filed a motion to correct error on October 27, 2010, which the trial court summarily denied on October 29, 2010. Crowel now appeals.

## Standard of Review

Indiana Code section 36–9–27–107 (2006) governs judicial review of drainage board decisions. Subsection (c) of the statute provides that "[i]n affirming or setting aside a decision or determination of the board, the court shall enter its findings and order or judgment on the record." Additionally, Indiana Trial Rule 52(A)(3) provides in relevant part that the trial court shall make special findings of fact without request "in any ... case provided by these rules or by statute." Thus, the trial court in this case was required to, and did, enter special findings of fact. *See Schrader v. Porter Cnty. Drainage Bd.,*

880 N.E.2d 304, 307 (Ind.Ct.App.2008), *trans. denied; Clouse v. Noble Cnty. Drainage Bd.,* 809 N.E.2d 849, 857 (Ind. Ct.App.2004), *trans. denied.*

■ The standard of review we apply to special findings entered under Trial Rule 52(A) is two-tiered. *Clouse,* 809 N.E.2d at 857. First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous. *Id.* Findings are clearly erroneous where a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* In reviewing the trial court's entry of special findings, we neither reweigh the evidence nor judge the credibility of witnesses, and we accept the ultimate facts as stated by the trial court if there is evidence in the record to sustain them. *Id.*

■ Additionally, where a trial court has entered special findings pursuant to Trial Rule 52(A), we may affirm the judgment on any legal theory supported by the findings. *Mitchell v. Mitchell,* 695 N.E.2d 920, 923 (Ind.1998). Before affirming on a legal theory supported by the findings but not espoused by the trial court, we should be confident that our conclusions are consistent with all of the trial court's findings of fact and the reasonable inferences flowing therefrom. *Id.*

## Discussion and Decision

On appeal, Crowel argues that the trial court erred in upholding the Drainage Board's assessment because the assessment was arbitrary, capricious, and not supported by substantial evidence. *See* Ind.Code § 36–9–27–107(b) (2006) (requiring the trial court to set aside a drainage board decision if it is arbitrary, capricious, unlawful, or not supported by substantial

evidence). Specifically, he argues the assessment was improper because his land will receive no benefit from the reconstruction.

Indiana Code section 36–9–27–34 (2006) provides in relevant part that the county surveyor shall classify a regulated drain as a drain in need of reconstruction when "it will not perform the function for which it was designed and constructed[.]" When a county drainage board refers a drain to the surveyor for a reconstruction report, "the surveyor shall determine and set forth in his report the best and cheapest method of reconstructing the drain so that it will adequately drain all affected land." Ind.Code § 36–9–27–49 (2006). Additionally, the surveyor shall estimate the costs of the proposed reconstruction and include in his report the name and address of each owner of land to be affected by the proposed reconstruction. *Id.* Once the surveyor files the reconstruction report, the county drainage board shall

> [p]repare a schedule of assessments containing *a description of each tract of land determined to be benefited by the reconstruction,* and the name and address of the owner of the land. The name, address, and description shall be taken from the surveyor's report. The board shall enter in the assessment schedule the percentage of the total cost of the reconstruction to be assessed against each tract of land, *with the percentage to be based upon the benefit accruing to the land from the reconstruction.* The percentage allocated to all lands benefited must be at least one hundred percent (100%) and as near to one hundred percent (100%) as is practicable.

\* \* \*

■ The board may consider the factors listed in section 112 of this chapter in preparing the schedules.

Ind.Code § 36–9–27–50 (2006) (emphasis added). Thus, assessments for the reconstruction of public drains must be apportioned based upon the benefits accruing to the land as a result of the reconstruction. *See Whitley, Noble and Allen Joint Drainage Bd. v. Tschantz,* 461 N.E.2d 1146, 1149 (Ind.Ct.App.1984) (noting that assessments for the maintenance of public drains must be apportioned based on the benefits accruing to each tract of land). In apportioning benefits under Indiana Code section 36–9–27–50, the board may consider the following factors:

> (1) the watershed affected by the drain to be constructed, reconstructed, or maintained;
>
> (2) the number of acres in each tract;
>
> (3) the total volume of water draining into or through the drain to be constructed, reconstructed, or maintained, and the amount of water contributed by each land owner;
>
> (4) the land use;
>
> (5) the increased value accruing to each tract of land from the construction, reconstruction, or maintenance;
>
> (6) whether the various tracts are adjacent, upland, upstream, or downstream in relation to the main trunk of the drain;
>
> (7) elimination or reduction of damage from floods;
>
> (8) the soil type; and
>
> (9) any other factors affecting the construction, reconstruction, or maintenance.

Ind.Code § 36–9–27–112 (2006).

■ Crowel argues that his property will receive no benefit from the reconstruction, and that he therefore should not be

assessed for any portion of its cost.[1] The Drainage Board did not issue any written findings specifying the manner in which Crowel's property was benefitted by the reconstruction project; rather, it issued a general order adopting the surveyor's report and schedule of assessments.

In contrast, the trial court made the specific findings required by Indiana Code section 36–9–27–107(c), but it made no finding that Crowel's property was benefitted by the reconstruction project. Instead, the trial court found that because Crowel's property is situated at the higher end of the watershed, "the natural flow of storm water run-off" from his property contributes to the flooding problems experienced by the owners of lower-lying parcels.[2] Appellant's App. p. 5. The trial court went on to conclude that "[t]he Board's finding that [Crowel's] property contributed to the flooding problems of the lower owners and that it was therefore appropriate that as a parcel within the watershed, he should contribute to the cost of the project is not arbitrary, capricious, nor unlawful and is supported by substantial evidence." *Id.* at 6. Significantly, the trial court made no findings that the surface water drainage caused any injury to Crowel's property. Thus, the issue before us is whether the additional drainage of surface water naturally flowing off of

1. Crowel also argues that his property is not located within the watershed area of Arm # 7. In support of this argument, Crowel notes that his land is located on the east side of Michigan Road. Crowel directs our attention to a copy of the public notice published in 1908 for the original construction of the Myers Ditch and claims that "none of the landowners which benefited from the original construction of ... Arm # 7 held, owned, or farmed property on the east side of Michigan Road." Appellant's Br. at 9. Although the notice lists several landowners whose land was determined to be affected by the construction, it does not contain full descriptions of each tract of land, and it therefore does not support Crowel's conclusion that none of the tracts originally determined to be affected by the construction of Arm # 7 included land located on the east side of Michigan Road. Crowel also argues that all eight arms of the Myers Ditch are located on the west side of Michigan Road, but this does not preclude a conclusion that parcels on the east side of Michigan Road are part of the same watershed. Finally, Crowel notes that his property is assessed maintenance fees on the Ballinger Ditch rather than the Myers Ditch, but the surveyor testified at the public hearing that the Ballinger and Myers ditches have been combined for the purposes of maintenance. But most importantly, the surveyor testified that if the blockage were removed from Crowel's private tile, water collected in the private tile would drain into Arm # 7, a point that Crowel does not dispute. This evidence is sufficient to support the trial court's finding that Crowel's property is located within the watershed area of Arm # 7.

2. Crowel argues that this finding is not supported by the evidence because "[t]he Board never produced any elevation studies to back up this finding and the evidence showed that the drain access, if any, from Crowel's property to Michigan Road was blocked by utility cables." Appellant's Br. at 12. As an initial matter, we note that in its finding, the trial court referred only to "the natural flow of storm water run-off" from Crowel's property. Appellant's App. p. 5. Thus, Crowel's alleged lack of access to artificial drainage by way of his private tile is irrelevant. With regard to the trial court's finding that the natural flow of surface water away from Crowel's property contributed to flooding problems on the lower-lying parcels of land, we note that the surveyor testified at the public hearing that Crowel's property is located at the high end of the watershed and that it contributes to the flooding problem. The surveyor testified further that he considered the topography of the area and ran a hydrology program to determine the volume of water moving within the tile. Additionally, maps that were made part of the record show the elevation profiles of the watershed area. This evidence was sufficient to support the trial court's finding that the flow of surface water away from Crowel's property, located at the higher end of the watershed, contributed to flooding problems in the lower-lying parcels.

Crowel's land and burdening the lower-lying parcels constitutes a benefit to Crowel's land supporting the Drainage Board's assessment. We conclude that it does not.

█ In determining whether lands are benefitted by a drainage project, we may only consider special benefits to the land, as opposed to general benefits that accrue to the landowner as a member of the community at large. *Hubenthal v. Crain*, 239 Ind. 646, 650, 159 N.E.2d 850, 852–53 (1959). Benefits are special when they increase the value of the property, relieve it from a burden, or make it especially adapted to a purpose which enhances its value. *Id.; Lipes v. Hand*, 104 Ind. 503, 503, 1 N.E. 871, 873 (1885). Further, it is not necessary that the benefits be direct and immediate to justify an assessment; future possibilities as well as collateral or indirect benefits may be considered. *Clouse*, 809 N.E.2d at 862 (citing *Hubenthal*, 239 Ind. at 650, 159 N.E.2d at 853).

In *Hubenthal*, our supreme court noted that in apportioning benefits to land, the surveyor must

consider the fact that the owners of the higher land have a right to the natural drainage of their land and that the owners of the low lands must assume this burden different from their better situated neighbors. And further, that although the owners of the higher lands are chargeable for the additional burden caused by their artificial drainage, owners of the low lands must also be charged according to the benefits which they receive from the increased artificial drainage which the ditch provides.

239 Ind. at 651, 159 N.E.2d at 853 (citations omitted).

█ *Hubenthal's* language is a corollary to Indiana's common law "common enemy doctrine" of surface water diversion. *See Argyelan v. Haviland*, 435 N.E.2d 973, 977–78 (Ind.1982). This doctrine provides that "surface water which does not flow in defined channels is a common enemy and that each landowner may deal with it in such manner as best suits his own convenience. Such sanctioned dealings include walling it out, walling it in and diverting or accelerating its flow by any means whatever." *Id.* at 975. Thus, it is not unlawful for a landowner to improve his land in such a way as to accelerate or increase the flow of surface water by limiting or eliminating ground absorption or changing the grade of the land, even where the improvement will cause water either to stand in unusual quantities on adjacent land or to pass into or over adjacent land in greater quantities or in other directions than the waters were accustomed to flow. *Bulldog Battery Corp. v. Pica Investments, Inc.*, 736 N.E.2d 333, 339 (Ind.Ct.App.2000); *Pickett v. Brown*, 569 N.E.2d 706, 708 (Ind.Ct.App.1991), *trans. denied.* "However, a landowner may not collect or concentrate surface water and cast it, in a body, upon his neighbor." *Pflum v. Wayne Cnty. Bd. of Comm'rs*, 892 N.E.2d 233, 237 (Ind.Ct.App.2008).

█ In the case before us, the trial court did not consider Crowel's right to the natural drainage of his land in upholding the Drainage Board's assessment. Rather, the court simply concluded that Crowel should be required to contribute to the reconstruction project because the natural flow of surface water runoff from his land contributed to drainage problems experienced by lower-lying parcels. This finding stands in stark contrast to the Indiana Code section 36–9–27–50 requirement that assessments be based on benefits accruing to the land to be assessed, not on a theory of fault with regard to injuries suffered by other parcels.

Although it may be inconsistent with the concept of being a "good neighbor," or a more laudable and generalized concept of the common good, under the common enemy doctrine, Crowel is entitled to the additional, natural drainage of surface water afforded his land due to its location on the high end of the watershed, and he is not liable to his neighbors for any damage to their property resulting from that drainage. *See Argyelan,* 435 N.E.2d at 975. We must therefore conclude that, as a matter of law, relieving the lower-lying parcels from flooding occasioned by the natural flow of surface water from Crowel's property does not benefit Crowel's land and, therefore, cannot form the basis of the reconstruction assessment levied against him. Because the trial court made no findings regarding any other benefit to Crowel's land, its findings were insufficient to support its judgment.

Though not cited by either party, we feel it prudent to address our supreme court's decision in *Culbertson v. Knight,* 152 Ind. 121, 52 N.E. 700 (1899). In that case, decided over a century ago, the court addressed a challenge to an assessment for the construction of a public drain brought by owners of land on the high end of the watershed who claimed that their lands were "sufficiently high above the proposed drain to enable them to successfully discharge upon lower lands the water falling and coming upon their grounds, and that consequently they can receive no benefits from the construction of the proposed ditch[.]" *Id.* at 121, 52 N.E. at 701. In affirming the assessment, the court reasoned that the upper estates used ditches as a system of artificial drainage, and that water draining from these ditches caused frequent flooding and injury to the lower-lying parcels. *Id.* The court also noted that the owners of the lower-lying lands "had the right to fight 'the common enemy,' and upon their own premises even to raise embankments, to ward off the water coming upon them by natural surface drainage ... and thus heap up the surface water upon the appellants' land, without relief to them except through our drainage laws." *Id.*

As noted above, the common enemy doctrine applies only to natural surface water drainage, and the doctrine does not allow a landowner to collect or concentrate surface water by artificial means and cast it, in a body, upon his neighbor. *Argyelan,* 435 N.E.2d at 976. Thus, in *Culbertson,* the appellants' use of ditches to collect surface water and divert it toward lower ground took them outside the protections of the common enemy doctrine.

Here, however, the trial court made no findings regarding any artificial drainage system on Crowel's property and referred only to "the natural flow of storm water run-off" from his property. Appellant's App. p. 5. And while it is at least theoretically possible that the owners of the lower-lying parcels could build dams around their property and cause surface water to back up onto Crowel's land, we do not interpret *Culbertson* as standing for the proposition that obviating the need for permitted surface improvements to the lower-lying parcels that might harm parcels situated higher in the watershed, standing alone, amounts to a benefit sufficient to support an assessment. We find this approach particularly appropriate in light of our supreme court's more recent statement in *Hubenthal* that the surveyor must "consider the fact that the owners of the higher land have a right to the natural drainage of their land and that the owners of the low lands must assume this burden different from their better situated neighbors." 239 Ind. at 651, 159 N.E.2d at 853 (citing *Culbertson,* 152 Ind. 121, 52 N.E. 700).

The Drainage Board directs our attention to evidence supporting the conclusion that Crowel's land will be benefitted in other ways by the reconstruction project. Specifically, they rely on the surveyor's testimony that Crowel's private tile drains into Arm # 7, and that if the blockage is removed from the private tile, Crowel's land will be benefitted by the additional drainage provided. But the trial court made no findings to that effect and we are bound by the findings before us. We reiterate here our standard of review: our analysis is limited to determining whether the trial court's findings are supported by the evidence and whether the findings support the judgment. *Schrader*, 880 N.E.2d at 307; *Clouse*, 809 N.E.2d at 857. And although we may affirm on a different legal theory than that espoused by the trial court, our theory must be supported by the trial court's findings. *Mitchell*, 695 N.E.2d at 923. Here, the trial court's only findings with regard to a supposed benefit to Crowel's land concerned relieving the lower-lying parcels from the ill effects of the natural flow of surface water from Crowel's land. As we explained above, these findings are insufficient to support the trial court's order. As an appellate court, we will not engage in the fact finding process required to conclude that Crowel's property will be benefitted in ways not expressed in the trial court's findings.

Because the trial court's findings were insufficient to support its conclusion that the Drainage Board's assessment was not arbitrary, capricious, unlawful, or not supported by substantial evidence, we must vacate the trial court's order. However, because evidence was presented at trial that might support the conclusion that

Crowel's land was benefitted by the reconstruction project, we remand to the trial court with instructions to reconsider the evidence in the record and enter new findings and conclusions, if warranted and as supported by the record. If, on remand, the trial court determines based on the evidence in the record that Crowel's land will be benefitted by the reconstruction project, its findings and conclusions should reflect the evidence that supports that determination. If, however, the trial court determines that Crowel's land will not be benefitted, as defined by statute and case law, it should enter judgment in favor of Crowel. We stress that neither Crowel nor the Drainage Board are to be given the opportunity to retry the case or present additional evidence on remand; the trial court's judgment should be based solely on the evidence in the record.[3]

Reversed and remanded with instructions.

KIRSCH, J., concurs.

VAIDIK, J., dissents with opinion.

VAIDIK, Judge, dissenting.

I respectfully disagree with my colleagues that the trial court's findings were insufficient to support its conclusion that the Drainage Board's assessment was not arbitrary, capricious, unlawful, or otherwise not supported by substantial evidence. My colleagues' opinion is premised upon the assumption that Crowel's land was not benefitted by reconstructing this drain. I disagree.

Drainage law was enacted for the public good "to promote the health, comfort, and convenience of the public." *Zigler v. Menges*, 121 Ind. 99, 22 N.E. 782, 783

---

**3.** Because we conclude that the trial court's findings are insufficient to support the conclusion that Crowel's land will be benefitted by the reconstruction project, we need not address Crowel's remaining arguments.

(1889). Long ago our Supreme Court determined that the drainage laws were an appropriate exercise of the police powers of the state. *Gifford Drainage Dist. v. Shroer*, 145 Ind. 572, 44 N.E. 636 (1896). With this recognition, an extensive regulatory system was designed to establish a joint enterprise to solve the common enemy of surface water problems.

The Marshall County Drainage Board oversees the drainage system in Marshall County for the benefit of its citizens. With the aid of the county surveyor, the Drainage Board determines watersheds within the county. A watershed is an area of land from which all runoff water drains to a given point. Ind.Code § 36–9–27–2. Drains within a watershed are constructed, reconstructed, and maintained by the Drainage Board in order to avoid flooding, standing water, and marsh areas.

My colleagues, the trial court, and the Drainage Board all agree that Crowel's property is in the watershed served by the reconstructed drain and his surface water empties into the drain in question. On its journey to the drain, Crowel's water travels through his neighbors' properties causing significant flooding especially when the drain is not working. Tr. p. 25. In my opinion, the fact that Crowel's water drains into the reconstructed drain, in and of itself, is enough to show that Crowel's property benefits from the reconstructed drain. It matters not that his water first travels through his neighbors' lower-lying properties before it finds its way into the drain. Crowel's water drains into the reconstructed drain; thus, his property benefits. *Culbertson v. Knight* supports this conclusion when stating that a land is benefitted "whether the drain passes through the land or not, in so far as it affords an outlet for the drainage of the land." 152 Ind. 121, 52 N.E. 700, 701 (1899). Broadly interpreting benefits in this matter is consistent with the policy of drainage law to establish an enterprise against the common enemy of standing water.

Further, "it is not necessary that the benefits be direct and immediate to justify an assessment. Future possibilities, if any, as well as collateral or indirect benefits, may be considered." *Hubenthal v. Crain*, 239 Ind. 646, 159 N.E.2d 850, 853 (1959) (citing 10 I.L.E. Ditches and Drains). While it is true that Crowel has a right to the natural drainage of his land under Indiana's common law "common enemy doctrine" of surface water diversion, it is also true that Crowel's neighbors have a right under the "common enemy doctrine" to dam water or to change the grade of their land to cause water to back up on Crowel's property. Thus, Crowel's neighbors have the right to engage in a water war to alleviate the flooding problems of their own property. The avoidance of a future water war with his neighbors is also a benefit, albeit an indirect one, to Crowel's land.

The majority correctly notes that in *Culbertson*, the higher-level landowner collected his surface water in a ditch before casting it on his lower-level neighbors' properties. Because *Culbertson* involved the collection of water by artificial means, the majority distinguishes this case from *Culbertson*. While this distinction surely exists, I do not believe that it makes a difference. Rather, I believe that the majority's opinion changes drainage law as it has been applied for a very long time, will promote water wars between neighbors, and undermines the legislative intent of resolving water problems by a common enterprise.

Attorney James Clevenger, Counsel for the Drainage Board, summarized the problem well at the hearing before the trial court. Clevenger argued:

It is not uncommon—we run into this all the time at Drainage Board hearings. Folks that are on the higher ground in the watershed their—their water naturally seeks lower ground. It gets away, so it's like well why am I paying to have this tile reconstructed? Well, because where it goes is where it's not supposed to go. It goes on these poor other people's property, so, I mean, we can have these people damming up the edge of their property so it doesn't get— leave, and then you have that particular problem. We decided long ago that that's not the proper way to do these things. The proper way is if you're getting water in your watershed you should pay your fair share to make sure that it is taken care of—uh—in a—in a proper way and doesn't burden the other landowners in the watershed.

Tr. p. 17–18.

For all of the reasons above, I respectfully dissent and would affirm the trial court.